ODELL, Respondent, v. NEW YORK CENT. & H. R. R. CO., Appellant. (Supreme Court, Appellate Division, Second Department. June 8, 1906.) Appeal from Special Term, Dutchess County. Action by Olivia Odell, as administratrix of William H. Odell, against the New York Central & Hudson River Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed. Robert Wilkinson, for appellant. Robert H. Barnett, for respondent.

PER CURIAM. Judgment and order denying motion for new trial affirmed, with costs. Order granting extra allowance reversed, with costs, for want of power in trial court to grant the same.

JENKS, J. (dissenting). The action is for negligence. Between 9 and 10 a. m. of November 28, 1902, the plaintiff's intestate, attempting to pass over a grade crossing of the defendant's railroad tracks in the village of Fishkill, was struck and instantly killed by the locomotive engine of the defendant's passenger train known as the "Empire State Express." The negligence charged by the complaint is that the train "moved and approached its aforesaid express train toward, upon and over the Main street crossing at a high and dangerous rate of speed without giving to the plaintiff's intestate any suitable or sufficient warning or indication, by bell and whistle or otherwise, of its approach to the aforesaid crossing with intent to cross the same, and in failing to provide by rule or otherwise for a suitable and sufficient announcement of the approach of its northbound express trains to the crossing aforesaid." The learned court charged the jury that they had a right to take into consideration (after referring to the location, condition, and use of the crossing), "whether the defendant's servant, the locomotive engineer, was guilty of negligence in not ringing his bell, if he did not ring it, or in not blowing the whistle, if he did not blow it, in approaching such a crossing as that," and continued: "If he did ring the bell or blow the whistle, there was really nothing else that he was called upon to do, and there is no other act of negligence charged. That is one of the vital points of this case." There was no exception or request that touched upon this part of the charge, which thus construed the complaint and thus defined the theory of the plaintiff. I think that the proof of this alleged neglect is not sufficient to support the verdict. A few moments before the accident, the intestate paused on his way towards the tracks to accost two young lads. They were within eight of ten feet of the intestate when he was killed. All of the witnesses who testified as to the signals were called by the plaintiff. I should add, however, that the testimony of the engineer on this subject was elicited on cross-examination. The lad Pearsall testifies: "Up to the time the accident occurred I heard no whistle blown from this train, nor any bell rung." The lad Secor testified: "Up to the time he was killed I did not hear any whistle blown by the train, nor any bell rung." Mr. Vanderberg, who stood at a window in the second story of an adjacent machine shop, after testifying that there were no gates, and that there was no flagman, continued: "There were no bells or signals." But on cross-examination he testifies: "When the Empire State express was approaching there was a whistle down there to the whistling post below the overhead bridge. It was the locomotive whistle. That was before the Empire State express passed the bridge. South of the bridge is where she blowed. I saw the train go through the bridge." When asked on redirect examination whether he wished to be understood as testifying that the whistle proceeded from that particular train, he answered: "I took it for that train. As a matter of fact, when I heard this whistle I could not see this train, and I had not seen it up to the time I heard the whistle." He added that it was not possible, where he stood, to see it, if the whistle had been blown at the whistling post. He also testified that there are railroad yards to the south and in the vicinity where he heard the whistle sound, and that cars were switched and locomotive engines moved in the yards, and that it was a common thing to hear whistles from that direction. He testifies that he did not hear the engine in question blow the whistle from the time it reached the bridge, or hear it ring any bell. He then testified on recross that as the train went under the bridge steam

was escaping from the smokestack of the locomotive engine, nothing was coming from the whistle, and continued: "It seemed to be a second after I heard the whistle that the train came through the bridge, almost immediately. I heard the signal." A reading of this testimony shows that, when the witness testifies, "There were no bells or signals," he referred to the precautions provided by the defendant at this crossing, and not to the precautions observed by the engineer of this train; for he was speaking of the former matters, and had just testified there were no gates, there was no flagman, and then continued, "There were no bells or signals." And his testimony thereafter given, which I have just detailed, relates to what he observed in respect to the signals from that train on that occasion. The engineer of the locomotive testifies that he blew the whistle between the bridge and the crossing, that at the whistling post he blew it for five seconds, that after he blew the whistle he started the bell, which worked by compressed air, and rung until the air was turned off, and that the bell continued to ring until he ordered the fireman to turn off the air, when he had stopped the train after the accident, and its ringing prevented his hearing the conductor, who was then talking with him. Analysis of the evidence shows that the two lads gave entirely negative testimony. It does not appear that they were "looking, watching, and listening for it, or that their attention was directed to the fact, so that the evidence will tend to some extent to prove the negative," to quote the words of Allen, J., writing for the court in Culhane v. N. Y. Cent. & H. R. R. R. Co., 60 N. Y. 133. It is true that in Greany v. L. I. R. R. Co., 101 N. Y. 419, 5 N. E. 425, the court say that one might be neither looking nor listening, and yet his position be such and the surrounding circumstances so favorable that his testimony might be of equal or greater persuasive power than that of one who both looked and listened under circumstances disadvantageous. And it might be argued, with reference to these young lads who gave negative testimony, that although there is no proof that either looked or listened, or that their attention was directed to the fact of signals, yet, as they were within eight or ten feet of the accident, their position was such as to enhance the value of their negative testimony. And yet this argument based on position may be materially weakened by the criticism that the attention of the lads was not upon the train, but was fixed upon the intestate; for Pearsall testifies that he looked and saw the train, and then "hollered" to the intestate, but when he thus cried out the intestate was looking north, and he also testifies that he saw the intestate step onto the track. Such, too, is the testimony, substantially, of the other lad. It is but natural that, after seeing the train, the attention of any one in such close proximity to the intestate would have been drawn to and riveted upon him, as that human being who was so close to a peril and whose immediate conduct must so largely determine whether he would encounter it. The qualification expressed in Greany's Case, supra, was applied to passengers on the train, who presumably could not have had their attention diverted by the peril of the person who attempted to cross in front of the locomotive engine of their train. Further analysis of the evidence as to signals shows that, opposed to the negative testimony which I have just considered is the testimony of Mr. Vanderberg, which I have heretofore detailed, who finally testified that "it seemed to be a second after I heard the whistle that the train came through the bridge, almost immediately. I heard the signal"—and of the engineer, whose testimony I have also detailed, and who is positive that he whistled at the whistling post, and that he gave a whistle between the bridge and the crossing, and that the bell was rung continually. The whistling post was 3,588 feet from the crossing where the accident happened, and the bridge 1,000 feet therefrom. The train, according to the evidence, took 13 seconds to pass from the bridge to the crossing. The intestate was walking. He stopped within 8 or 10 feet of the rails to talk with the lads. He then walked on his way. Mr. Vanderberg says that he halted once again, and that he was then but 3 or 4 feet from the track, and the lads say that he walked onto the track. If the whistle was sounded and the bell was rung, as testified to, then it seems that such warning was timely. Of course, as was observed in Greany's Case, supra, the fact that the best evidence was that of the engineer, an employé of the defendant, did not require the plaintiff to put her case in his hands, to the exclusion of secondary evidence. But the engineer is so far sustained by the disinterested witness, Mr. Vanderberg, that I think that the plaintiff, who must depend upon the negative testimony of the two lads, should not prevail. I do not say that the question was not for the jury, but I do say that I am dissatisfied with the verdict as against the weight or preponderance of evidence upon the point pronounced "a vital one" by the learned court, and I therefore advise that the judgment and order should be reversed, and a new trial granted, costs to abide the event. McDonald v. Met. St. R. Co., 167 N. Y. 66, 60 N. E. 282.